UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

MONICA BERMUDEZ,                          :
                                          :
                              Plaintiff,  :
                                          :      1:10-CV-1162 (ALC)
            -against-                     :
                                          :      OPINION & ORDER
CITY OF NEW YORK, et al.,                 :
                                          :
                              Defendants. :
-----------------------------------------------------------x

ANDREW L. CARTER, JR., United States District Judge:

## I.      INTRODUCTION

In this action, Plaintiff Monica Bermudez ("Plaintiff" or "Bermudez") asserts claims of

race, religious, and gender based employment discrimination under federal, state and local law

against the City of New York and several of her fellow New York City Police Department

("NYPD") officers.  Presently before the Court is a motion for summary judgment by the four

remaining defendants in this action, the City of New York, Lieutenant Donald Stroman, and

Officers Edward Sanabria and Serina Smith (collectively referred to herein as "Defendants").

For the reasons described herein, that motion is granted in part and denied in part.

## II.     BACKGROUND

### A.      Factual Background

The following facts are drawn from Plaintiff's "Response to Defendants' Local Rule 56.1

Statement of Undisputed Material Facts" (ECF No. 76), and Defendants' "Local Rule 56.1

Statement of Undisputed Material Facts" (ECF No. 59), as well the underlying evidence cited

therein.  Where the facts are subject to legitimate dispute, they are construed in favor of the

Plaintiff as the non-moving party. *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir.

1993).

Plaintiff is a female of Puerto Rican descent and has been an NYPD police officer since July 1996.  (August 14, 2014 Moshe C. Bobker Decl., Ex. A, Bermudez Dep. 11:13-16, 28:18-21, May, 18, 2010 (hereinafter "2010 Bermudez Dep.").)  At all relevant times herein, Plaintiff was a practicing Catholic.  (2010 Bermudez Dep. 38:9-24.)  Plaintiff was transferred to the NYPD's Bronx Evidence Collection Team ("BECT") on or about January 12, 2004, at which time she alleges that Defendants began a course of discriminatory and abusive conduct towards her.  (2010 Bermudez Dep. 10:24–11:1.)  While Plaintiff's complaint asserts claims of such conduct against seven officers, the Court will primarily focus here on her allegations against the individual officers who remain as defendants, i.e., Lieutenant Stroman and Officers Sanabria and Smith.

1.      *Lieutenant Donald Stroman and Officer Serina Smith*

a.      Sexual Harassment

Plaintiff contends that, immediately upon her transfer to BECT in January 2004, Stroman began making "unwanted sexual advances" towards her.  For example, Plaintiff testified that Stroman invited her to his house for drinks between five and ten times.  (2010 Bermudez Dep. 55:6-14.)  She testified that her response to the invitation was to indicate that she would accept his invitation if Stroman attended church with her, because she believed that he would not do so.  (2010 Bermudez Dep. 55:3-5, 15-18.)  Plaintiff testified that Stroman would also call her on her cellular phone to "express his romantic feelings" and say that she had "a beautiful body" and that he "loved" her and wanted to "make love" to her, (2010 Bermudez Dep. 55:23-25, 56:1-8), and would also make similar comments about her dress, looks and deportment to her in person.  (2010 Bermudez Dep. 56:14-17.)  Plaintiff testified that she initially misperceived these statements as benign and thanked him for them, until she realized that they were a "different kind

2

of compliment." (2010 Bermudez Dep. 58:6-9.) She testified that she eventually told Stroman

that she was not interested in him and that they only had a professional relationship. (2010

Bermudez Dep. 55:19-22, 58:1-13.) Plaintiff testified that she gave Stroman a flask as a gift for

Christmas in December 2004. (2013 Bermudez Dep. 29:10-25.)

   Plaintiff testified that on 10 to 20 occasions from May 2004 to some point in 2006,

Stroman requested that Plaintiff remove her vest so that he could "hug" her. (2010 Bermudez

Dep. 59:1-15.) Plaintiff also testified that, in December 2004, Stroman ordered her and Officer

Sanabria—her partner at the time—downstairs to the garage of the evidence collections office,

where he yelled at them that he "want[ed] to know what the fuck was going on." (Bobker Decl.,

Ex. B., Bermudez Dep. 26:23–28:6, Oct. 8, 2013 (hereinafter "2013 Bermudez Dep.").) At her

May 18, 2010 deposition, Plaintiff testified that Stroman never tried to touch her in a sexually

suggestive way, kiss or force himself on her, (2010 Bermudez Dep. 60:6-11), but testified at her

October 8, 2013 deposition that, until October 2006, he would kiss her on the cheek "two or

three times a week" and that "on several occasions" Stroman would "put his arms around" her

and "press against" her. (2013 Bermudez Dep. 90:15-25.) She further testified that she did not

tell Stroman to refrain from kissing her, but that he ceased doing so after she filed a complaint

with the NYPD's Office of Equal Employment Opportunity ("OEEO") on October 2, 2006.

(2013 Bermudez Dep. 90:20-25.) Nonetheless, Plaintiff testified that, at some point in 2007,

after she filed her 2006 OEEO Complaint, Stroman and Sergeant Charles Neusch retaliated

against her by excluding her from informal nad impromptu meetings regarding changes in BECT

protocol. (2013 Bermudez Dep. 56:17–59:19.)

   In October 2007, Plaintiff testified that she was sitting at a table with Smith and Stroman

when Stroman indicated that he was "very hungry." (2010 Bermudez Dep. 68:6-15.) Plaintiff

testified that Smith then "pushed away the table, opened her legs and told Lieutenant Stroman come eat[,] [and that Stroman] stuck out his mouth simulating oral sex." (2010 Bermudez 68:6–12.) Plaintiff testified that she was incredulous and got up and left. (2010 Bermudez Dep. 68:12-15.) This is Plaintiff's only allegation of discriminatory conduct by Smith.

b.    Other Acts of Hostility

Plaintiff's 2006 OEEO complaint also charged Stroman with religious discrimination. As to this, Plaintiff testified that, approximately four to six months after her transfer to BECT, she requested Sundays and Mondays off from Stroman so that she could attend church services and confirmation classes, but the this request was only granted approximately 12 to 18 months afterwards. (2010 Bermudez Dep. 38:17–39:13.) She also testified that, beginning shortly after she was confirmed in January 2005 until October 2006 (when she filed her OEEO complaint), Stroman and Officer Denise Diaz would make comments like "praise the Lord" or "Halleluiah" whenever she walked into the room, and that Stroman in particular made such comments about six to eight times a week. (*See* 2010 Bermudez Dep. 40:17–42:3, 47:3–48:8.) Additionally, Plaintiff testified that a few months after her confirmation ceremony, to which she had invited Stroman, he on one occasion repeatedly stated "[y]ou know these religious fanatics" while speaking to another officer but looking in her direction. (2010 Bermudez Dep. 40:20-24, 43:19–44:2.) Plaintiff also testified that when she extended Stroman invitations to attend church with her in response to his invitations to visit his home, Stroman would sometimes state that "he would burn in hell if he set foot in church, there was no way he would go to church that he loved the alcohol and women too much for him to attend church because he was going to burn in hell anyway." (2010 Bermudez Dep. 42:9–20.)

Plaintiff also testified that, on one day in 2007, after she had taken a couple of messages

4

for Stroman, she went into his office to relay the messages, and he became "aggressive" and stated that she "should be concerned" and "worried about her position in the [BECT]." (2010 Bermudez Dep. 44:6-13.)   Plaintiff responded that "there was only one person [she] would be worried and [sic] that would be [her chief]." (2010 Bermudez Dep. 44:15-16.)  When Stroman asked "your chief?" Plaintiff stated, "Yes, God." (2010 Bermudez Dep. 44:16-17.)  Plaintiff testified that Stroman told a Patrolmen's Benevolent Association delegate that she was an "emotionally disturbed person" because of her "chief" comment.  (2010 Bermudez Dep. 44:17 – 45:11.)

Plaintiff testified that Stroman was similarly antagonistic towards her after she had back surgery on January 17, 2006, after which she was out of the office for the first two months for recovery, and then returned to work on limited duty status on March 14, 2006, was placed on restricted duty in April 2006, and then finally returned to full duty status February 2007. (2013 Bermudez Dep. 34:17–35:8.)   Plaintiff testified that, during the first two months of recovery, Stroman and Neusch called her constantly to inquire about when she would return, the opinions of her doctor, and whether she was receiving disability.  (2010 Bermudez Dep. 97:3–98:2.) Plaintiff also testified that she overheard comments between Stroman and Neusch where they stated that they believed she was feigning her injury, (2010 Bermudez Dep. 101:7-19), and that, at Stroman's direction and without any legitimate reason, Neusch instructed her that she could not read the patrol guide while she was on restricted duty.  (2010 Bermudez Dep. 102:3-10). Plaintiff testified that, also at Stroman's behest, she was directed to work distributing vests to NYPD personnel in the "vest unit" for a two-week period during the end of October or beginning of November in 2006, despite the fact that the lifting it entailed was contrary to her restricted duty status. (2010 Bermudez Dep. 105:15-28, 107:8-25, 108:19-21.)  Plaintiff also testified that

5

at some point in 2006 while she was on restricted duty, Lieutenant Stroman changed her chart from patrol to administrative. (2013 Bermudez Dep. 35:15-22.) Plaintiff testified that while the NYPD Administrative Guide, did officially require the change, and her responsibilities remained the same, there were other officers in the unit who also satisfied the criteria for the administrative chart but were not so placed. (2013 Bermudez Dep. 36:6–37:23.)

c.   Aftermath

Plaintiff requested a transfer to the Internal Affairs Bureau ("IAB") in mid-2007, and it was granted in November 2007. (2010 Bermudez Dep. 116:4-11.) She testified that she requested the transfer in interests of her mental state, safety and well-being, and that she requested IAB in particular because she felt it would insulate her from Stroman, Neusch and Inspector Wayne Bax. (2010 Bermudez Dep. 116:15-24.)

At some point after the transfer, however, Plaintiff testified that she had to return to BECT to retrieve paperwork for a case. (2013 Bermudez Dep. 17:14-20.) While waiting on the paperwork, Stroman entered the room and asked her if she had official business there, and she responded yes. (2013 Bermudez Dep. 17:21–18:1.) Stroman then told Plaintiff to "get what you need and get the fuck out." (2013 Bermudez Dep. 18:2-3.)

Plaintiff filed another complaint with OEEO on December 3, 2007, in which she complained of Stroman and Neusch's conduct and noted that she had been ridiculed after filing her first complaint with OEEO in October 2006. (*See* Bobker Decl., Ex. D.)

2.   *Officer Edward Sanabria*

Plaintiff testified that, about a month after Sanabria's arrival at BECT, he was assigned as her partner. (2010 Bermudez Dep. 73:19-22.) Plaintiff testified that, approximately one month into their partnership, Sanabria asked her out for dinner as they were departing work one

6

evening. (2010 Bermudez Dep. 74:7-22.) Plaintiff testified that she and Sanabria had a couple of drinks during dinner and that, after dinner Sanabria offered to fix her computer at her home that evening, and that she accepted. (2010 Bermudez Dep. 73:21-22, 75:6-20.) Plaintiff testified that when they arrived at her home, they opened a bottle of wine, started to watch a movie and eventually fell asleep on the sofa. (2010 Bermudez Dep. 75:22-25.) Plaintiff testified that when she awoke she told Sanabria he had to leave but, since he was too inebriated to drive, she allowed him to spend the night. (2010 Bermudez Dep. 75:25–76:16.) Plaintiff testified she told Sanabria that she was not romantically interested in him, and that he did not do anything untoward that evening. (*See* 2010 Bermudez Dep. 76:10-18.)

Nonetheless, Plaintiff testified that Sanabria "had this notion in his head [that they] were a couple" the following morning, and mentioned returning to her home, cooking dinner and inviting his daughter. (2010 Bermudez Dep. 76:18-23.) Plaintiff testified that she responded that they had only had dinner and a few drinks and reiterated that she was not interested in Sanabria romantically. (2010 Bermudez Dep. 76:21–77:4.) Plaintiff testified that Sanabria then became "irate," and yelled that he "knew [Plaintiff] was going to do this," at which point she asked him to leave. (2010 Bermudez Dep. 77:4-8.)

Plaintiff testified that, after that evening, Sanabria continuously attempted to convince her that she had feelings for him, despite her persistent denials. (2010 Bermudez Dep. 78:8-10.) In particular, Plaintiff testified that, on one occasion, when Plaintiff reiterated her lack of romantic interest in Sanabria while they were in a patrol car, Sanabria became agitated and began driving in an extremely reckless manner like a "bat out of hell." (2010 Bermudez Dep. 80:12–81:5.) Plaintiff also testified that while they were on assignments in 2004, Officer Sanabria would stand an inch or two behind her, looking over her shoulder to see what she was doing.

7

(2010 Bermudez Dep. 84:4-12.)  Plaintiff testified that she told Sanabria that this made her

uncomfortable, but that he did not really see a problem with it.  (2010 Bermudez Dep. 84:12-14.)

Plaintiff testified that this happened a few times before Sanabria stopped.  (2010 Bermudez Dep.

84:15-16.)

      Plaintiff testified that, on an evening in December 2004, she reluctantly danced with

Sanabria at an NYPD Christmas Party, after multiple requests from him.  (2010 Bermudez Dep.

85:19–87:3; 2013 Bermudez Dep. 30:4-8.)  Plaintiff further testified that, shortly after she

departed from the party, Sanabria called her and expressed a desire to speak with her in person.

(2010 Bermudez Dep. 87:7-24.)  Plaintiff testified that, in effort to get Sanabria to see where she

was coming from, she allowed him to come to the front of her home, but told him that she would

not allow him upstairs into her apartment.  (2010 Bermudez Dep. 88:1-4.)

      Plaintiff testified that she was walking her dog when Sanabria arrived at her home and

that she requested that Sanabria remain outside while she took her dog upstairs, but that Sanabria

shook the door after she shut it in an effort to enter.  (2010 Bermudez Dep. 88:15-24.)  Plaintiff

testified that when she came back downstairs and got back in Sanabria's car, she began to

express her frustration with Sanabria about his conduct, (2010 Bermudez Dep. 89:1-4), at which

point Sanabria indicated that he was not happy with the way Plaintiff spoke to him.  (2010

Bermudez Dep. 89:9-12.)  Plaintiff testified that she responded that she did not know how else to

communicate with him because her other efforts were not fruitful, and that Sanabria then became

irate and began to hit the steering wheel and yell that "he wasn't going to fucking take this

anymore" and that he "was sick and tired of this shit." (2010 Bermudez Dep. 89:4-23.)  Plaintiff

testified she then ended the conversation, exited the car and went into her home.  (2010

Bermudez Dep. 89:23-25.)  She further testified that, one or two days later, she told Lieutenant

Stroman that she did not feel comfortable working with Sanabria and requested a schedule change, which Stroman granted. (2010 Bermudez Dep. 91:12–92:1.) She has not had any contact with Sanabria since.

*      *      *

Plaintiff testified that she suffered from anxiety, insomnia, nervousness and other issues because of the foregoing conduct by Defendants, and that she sought counseling from a psychologist and was prescribed anti-depressant medication. (2013 Bermudez Dep. 80:24 – 81:7, 84:10-13, 85:3-12; *see also* August 14, 2014 Bobker Decl., Ex. E, Notes of Dr. Richard Levenson.)

### B.     Procedural Background

Plaintiff filed her complaint in this action on February 26, 2010 against the Defendants and four other police officers, Wayne Bax, Brandon Croke, Charles Neusch and Denise Diaz. (ECF No. 1.) The Complaint asserted 21 overlapping employment discrimination claims under state, federal and city law against each Defendant. Specifically, Plaintiff asserted claims under: (1) 42 U.S.C. § 1981, for racial discrimination (Count I), retaliation (Count II) and hostile work environment (Count III); (2) 42 U.S.C. § 1983, for racial discrimination (Count IV), gender discrimination (Count V), sexual harassment (Count VI), religious discrimination (Count VII), retaliation (Count VIII), and hostile work environment (Count IX); (3) the New York State Human Rights Law ("NYSHRL"), N.Y. Exec Law § 296, *et seq.*, for racial discrimination (Count X), gender discrimination (Count XI), sexual harassment (Count XII), religious discrimination (Count XIII), retaliation (Count XIV), and hostile work environment (Count XV); and (4) the New York City Human Rights Law ("NYCHRL"), N.Y. Admin. Code § 8-107, *et seq.*, for race discrimination (Count XVI), gender discrimination (Count XVII), sexual

9

harassment (Count XVIII), religious discrimination (Count XIX), retaliation (Count XX) and hostile work environment (Count XXI).

On April 9, 2010, the City of New York filed a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. (ECF No. 9.)  On May 13, 2010, the individual defendant officers filed a joint motion to dismiss the complaint.  (ECF No. 16.)  Then, after Plaintiff was deposed in May 2010, the officers then filed a motion for summary judgment on the grounds of qualified immunity (ECF No. 23), consistent with the Individual Rules of Practice of Judge McMahon, who was presiding over the matter at the time.

In a March 25, 2011 Decision & Order (the "Decision & Order"), Judge McMahon granted and denied in part the motions of the individual defendants and denied in whole the motion to dismiss by the City of New York. *See Bermudez v. City of N.Y.*, 783 F. Supp. 2d 560 (S.D.N.Y. 2011).  Judge McMahon dismissed all claims against Neusch, Diaz, Croke and Bax for failure to state a claim and/or as barred by the relevant statute of limitations.  *Id.* at 589-93, 600-612.  Against Stroman, Sanabria and Smith, the Order dismissed all claims against them save for: Count II—hostile work environment under § 1981; Count VI—sexual harassment under § 1983; Count IX—hostile work environment under § 1983; Count XII—sexual harassment under the NYSHRL; Count XV—hostile work environment under the NYSHRL; Count XVIII— sexual harassment under the NYCHRL; and Count XXI—hostile work environment under the NYCHRL.  *Id.* at 612.  The dismissal was with prejudice as to all claims except for the retaliation claims against Stroman, i.e., Counts II, VIII, XIV and XX, for which Judge McMahon granted Plaintiff leave to replead, *id.*, although no amended complaint was filed.  Judge McMahon declined to reach the merits of the City of New York's motion to dismiss.  *Id.*

With respect to the surviving claims against Stroman, Judge McMahon found that

10

"[b]ased on Bermudez's testimony, a reasonable person would find that Stroman's actions and comments and actions between 2004 and 2007 were sufficiently severe and pervasive so as to create a hostile work environment" and sustained her sexual harassment claims and hostile work environment claims under §§ 1981 and 1983, the NYSHRL and the NYCHRL. *See id.* at 583-89; *see also id.* at 584 ("At a minimum, Bermudez has pleaded sufficient facts from which a reasonable juror could find that she was subject to a workplace permeated with harassment that was sufficiently severe and pervasive as to the alter the conditions of her work environment."). Judge McMahon also found that Stroman was not entitled to qualified immunity on any of these counts because "no reasonable supervisor in Lieutenant Stroman's position could have thought that he was permitted to make [the] sexual advances and sexually-charged comments [alleged by Bermudez] to an employee in the workplace," *id.* at 584, since proscriptions against sexual harassment in the workplace were clearly established in federal, New York state and New York City law. *Id.* at 584, 587, 588. Finally, Judge McMahon found that these claims were timely under the continuing-violation doctrine because "taken as whole," Plaintiff's complaint alleged a hostile work environment throughout her tenure in the BECT, including at least one act that occurred within the statute of limitations period. *Id.* at 582.

As to Sanabria, Judge McMahon concluded in sustaining Bermudez's sexual harassment and hostile work environment claims against him that Bermudez had "adduced sufficient evidence from which a reasonable jury could conclude that Sanabria's conduct . . . contributed to th[e] hostile work environment [created by Bermudez's colleagues and supervisors.]" *Id.* at 597. She found that the claims against Sanabria were timely because Bermudez had alleged at least one timely act. *Id.* at 597-98. She also found that Sanabria was not entitled to qualified immunity for the same reasons as Stroman. *See, e.g., id.* at 598.

11

Lastly, with respect to Smith, Judge McMahon found the sexually explicit, "disgusting pantomime" incident involving Smith and Stroman in October 2007 was sufficient to sustain Bermudez's hostile work environment and sexual harassment claims against her. *Id.* at 593-94. She found specifically that "[a] reasonable jury could conclude th[is] . . . gross incident of sexual harassment[] was sufficiently severe so as to a create a hostile work environment." *Id.* at 594. She further held that Smith was not entitled to qualified immunity because "[n]o reasonable person in [her] position could have thought that she was permitted to engage in a gross and sexually explicit act towards a colleague in the workplace." *Id.*

## III.   LEGAL STANDARDS

Under Rule 56(a) of the Federal Rules of Civil Procedure, a court can grant summary judgment if the record "shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law," and in genuine dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party can satisfy their burden by showing that the non-moving party has failed "'to come forth with evidence to permit a reasonable juror to return a verdict in his or her favor' on an essential element of a claim." *Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (quoting *New Orleans Emps. Ret. Sys. v. Omnicom Grp., Inc.*, 597 F.3d 501, 509 (2d Cir. 2010)).

To avoid summary judgment, a party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 586 (1986).  Rather, the party "must set forth specific facts showing that there is a genuine issue for trial," through affidavits or other evidence, as opposed to allegations or denials in the pleadings.  *Anderson*, 477 U.S. at 248, 250.  Speculation, conclusory allegations and conjecture are not enough to raise genuine issues of fact.  *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (citing *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985) (per curiam)).  However, where there is a genuine dispute, this concludes the court's inquiry, because "[a]ssessments of credibility and choices between conflicting versions of the events are . . . not for the court on summary judgment." *Jeffreys v. City of N.Y.*, 426 F.3d 549, 554 (2d Cir. 2005) (citing *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996)).

## IV.    DISCUSSION

Defendants seek summary judgment against the Plaintiff on the grounds that: (1) her hostile work environment and sexual harassment claims fail because the alleged actions were nothing more than petty slights that did not alter the terms and conditions of her employment and because she did not subjectively perceive her environment as hostile; (2) her religion and race based hostile work environment claims are legally insufficient; (3) she has failed to adduce evidence of a policy, practice, or custom of discrimination, as required for her §§ 1981 and 1983 claims against the City of New York; and (4) her retaliation claims against the City of New York fail because the asserted retaliatory actions are not legally cognizable.

### A.  Plaintiff's Hostile Work Environment Claims

A hostile work environment claim under §§ 1981 and 1983 and New York state law, requires a plaintiff to show that, because of her membership in a protected class, her workplace was "permeated with discriminatory intimidation, ridicule, and insult, that [was] sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working

environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quotation marks and citations omitted); *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 227 (2d Cir. 2004); *see also*; *Forrest v. Jewish Guild for Blind*, 3 N.Y.3d 295, 305, 310-11, (N.Y. 2004) (applying standard for New York state law claim of hostile work environment); *Kumaga v. N.Y.C. Sch. Constr. Auth.*, No. 127817/02, 2010 WL 1444513, at *8 (N.Y. Sup. Ct. Apr. 2, 2010) (NYSHRL). Whether an environment is "hostile" or "abusive" is determined by an analysis of the totality of the circumstances, including: (1) the frequency of the conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with the employee's "work performance." *Harris*, 510 U.S. at 23.  A single act can meet this threshold, but only if, "by itself, it can and does work a transformation of the plaintiff's workplace." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (citing *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000); *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 437 (2d Cir. 1999)).  A plaintiff must also show both that she found the environment offensive, and that a reasonable person also would have found the environment to be hostile or abusive. *Harris*, 510 U.S. at 21-22.

The standard for maintaining a hostile work environment claim under the NYCHRL is lower, because the statute was "intended to be more protective than the state and federal counterparts." *Farrugia v. N. Shore Univ. Hosp.*, 820 N.Y.S.2d 718, 724 (Sup. Ct. 2006).  The NYCHRL imposes liability for harassing conduct that results in any unequal treatment, and the "severity" and "pervasiveness" of the conduct is germane to the issue of damages, not liability. *Williams v. N.Y.C. Hous. Auth.*, 61 A.D.3d 62, 76 (1st Dep't 2009) (citing *Farrugia*, 820 N.Y.S.2d at 725).  That said, even under the NYCHRL, "'petty, slight, or trivial

inconvenience[s]' are not actionable." *Kumaga*, 2010 WL 1444513, at *14 (quoting *Williams*, 872 N.Y.S.2d at 38).

The Second Circuit has cautioned district courts that the existence of a hostile work environment "presents mixed questions of law and fact that are especially well-suited for jury determination." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 605 (2d Cir. 2006). Thus, "[t]hat the facts are undisputed does not automatically mandate summary judgment; rather, summary judgment is appropriate only where application of the law to those undisputed facts will reasonably support only one ultimate conclusion." *Id.* (citing *Richardson v. N.Y. State Dep't of Corr. Serv,*, 180 F.3d 426, 438 (2d Cir. 1999)).

> 1. *Defendants' argument that Plaintiff's gender and sexual harassment based incidents of hostility are not sufficiently "severe" or "pervasive" is foreclosed by law of the case.*[1]

Under the law of the case doctrine, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *DiLaura v. Power Auth. of N.Y.*, 982 F.2d 73, 76 (2d Cir. 1992). The rationale for the doctrine is that, "where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again." *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992). The doctrine, however, is only discretionary and does not forestall courts from reconsidering their own decisions prior to the entry of a final judgment. *Id.* It thus does not apply where, for example, a district judge "revisit[s] a conclusion based on factual allegations taken as true at the motion to dismiss stage, and [then] determine[s],

---

[1]     As Judge McMahon recognized in the Decision & Order, gender based hostile work environment overlap factually and doctrinally with her sexual harassment claims, which are also in the form of hostile work environment claims. *See Bermudez*, 783 F. Supp. 2d at 585. For this reason, the Court analyzes them together here.

based on undisputed evidence at the summary judgment stage, that no reasonable jury could [draw that conclusion.]" *Maraschiello v. Buffalo Police Dept.*, 709 F.3d 87, 97 (2d Cir. 2013) (citing *Brown v. City of Syracuse*, 673 F.3d 141, 148 (2d Cir. 2012)); *see also Jean-Laurent v. Lawrence*, No. 12–CV–1502 (JPO), 2015 WL 1208318, at *5 (S.D.N.Y. Mar. 17, 2015) (granting motion for summary judgment after denying motion to dismiss because plaintiff had not presented sufficient evidence on element for which he bore burden of proof at trial).

In contrast, however, law of the case generally does control where a party fails to cite to any evidence or absence of evidence justifying the reexamination of a prior ruling on a motion. *See, e.g., Vazquez v. City of New York*, No. 10–CV–6277 (JMF), 2014 WL 4388497, at *9 (S.D.N.Y. Sept. 5, 2014) (denying motion for summary judgment which raised issues decided in motion to dismiss in light of Defendant's failure to cite to any evidence warranting revisiting those rulings).[2]  In this case, the Court finds that Defendants' arguments regarding the sufficiency of Plaintiff's gender and sexual harassment based hostile work environment claims are precluded by law of the case, since they are not materially different from arguments rejected by Judge McMahon in the Decision & Order denying the motions to dismiss and for summary judgment on qualified immunity.  Specifically, Judge McMahon determined in the Decision & Order that, based on Plaintiff's complaint and her 2010 deposition testimony (which substantially tracks and supplements the allegations in the complaint), the motions should be denied as to Plaintiff's gender and sexual harassment based hostile work environment claims. Judge McMahon explicitly held that Defendants' conduct was, as alleged in the complaint and in

---

[2]      Law of the case is also inapplicable where reconsideration is a necessary to correct a clear error or prevent manifest injustice, or where there is an intervening change in the applicable law. *See, e.g., Benavidez v. Piramides Mayas Inc.*, No. 09 CV 9574, 2013 WL 2357527, at *3 (S.D.N.Y. May 24, 2013). Defendants do not argue that any of these circumstances apply here, however.

Plaintiff's 2010 deposition testimony, severe and pervasive enough to alter the terms and conditions of Plaintiff's employment. With no additional evidence in the record on Defendants' present motion for summary judgment beyond Plaintiff's 2013 deposition testimony (which only further supplements her allegations), this Court sees no reason to reevaluate Judge McMahon's analysis in the Decision & Order, and in fact agrees with much of it.[3]

> 2.  *Plaintiff's hostile work environment claims based on race and religion have been dismissed.*

While Judge McMahon's analysis in sustaining Plaintiff's hostile work environment claims against Sanabria, Stroman and Smith focused primarily on Plaintiff's allegations of a gender and sexual harassment based work environment, Plaintiff's § 1983, NYSHRL and NYCHRL hostile work environment claims, i.e., Counts IX, XV and XXI, are based on her gender, race, *and* religion. (Compl. ¶¶ 186, 209, 232.) On the present motion, the parties quarrel about whether Plaintiff's race and religion based hostile work environment claims should survive summary judgment. However, as indicated below, the Court finds that a review of Judge McMahon's analysis in the Decision & Order elucidates that she necessarily founds these claims insufficient in reaching her decision. Thus, consistent with law of the case, the Court will adhere

---

[3]     As the Court sustains Plaintiff's gender based hostile work environment claims based on the underlying rationale of the Decision & Order, it does not consider the relevance or sufficiency of the allegations underlying Plaintiff's dismissed gender, non-sexual harassment based hostile work environment claims against Sergeant Neusch.

Additionally, the Court does not address whether Plaintiff's § 1981 hostile work environment claims should have in fact been dismissed in the Decision & Order because of Plaintiff's failure to allege or adduce evidence on the essential element that the challenged conduct have created a hostile work environment *"because of [her] race." See, e.g., Albert-Roberts v. GGG Const., LLC*, 542 F. App'x 62, 63 (2d Cir. 2013) (summary order) (citing *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007)). While the Decision & Order expressly notes the lack of any nexus between Plaintiff's claims against Stroman, Sanabria and Smith and Plaintiff's race, *see, e.g., Bermudez*, 783 F. Supp. 2d at 581, 593, 596-97, the issue was not raised by Stroman, Sanabria or Smith in a timely-filed motion for reconsideration, or on the present motion for summary judgment.

to those prior determinations. *In re Initial Pub. Offering Sec. Litig.*, 544 F.Supp.2d 277, 284 (S.D.N.Y. 2008) ("The law of the case doctrine generally forecloses relitigation of issues expressly or impliedly decided earlier in the proceeding.").

First, the dismissal of Plaintiff's race based hostile work environment claims follows from the fact that the claims are predicated exclusively on Neusch's derogatory comments about Puerto Ricans, Latinos and Hispanics. *See, e.g.,* Pl.'s Memo. of Law in Opp'n to Defs' Mot. for S.J., at 20 (citing Neusch's alleged comments as sole support for race-based hostile work environment claims). As to Sergeant Neusch individually, Judge McMahon explicitly held that these comments were insufficient to maintain Plaintiff's race-based hostile work environment claims because "[s]uch comments do not establish that the harassment was sufficiently 'offensive, pervasive, and continuous to create an abusive working environment [under federal law],'" *Bermudez*, F. Supp. 2d at 602, and were instead akin to "petty slights and inconveniences insufficient to maintain a hostile work environment claim [under the NYCHRL.]" *Id.* at 604-05. In light of this determination, and the fact that there is no other evidence of race-based hostility against Plaintiff, it follows that such a claim cannot be maintained as to any defendant in this case, including the City of New York.

The dismissal of Plaintiff's religion based hostile work environment claims follows by a similar logic. Judge McMahon's qualified immunity analyses with respect to Lieutenant Stroman (one of two principal perpetrators in the alleged religious hostility), for example, was limited to Stroman's alleged conduct of gender based hostility and sexual harassment. *Id.* at 584-89. Had Judge McMahon found that Stroman created or contributed to a religious based hostile environment, however, she would necessarily had to have discussed whether Stroman was entitled to qualified immunity analysis as to that conduct as well. *See, id.* at 580 ("*only if the*

18

*officer defendant violated the plaintiff's constitutional rights* will the Court have to decide

whether a reasonable officer in defendant's position . . . ought to have known that he was

violating plaintiff's rights by doing what plaintiff alleges he did"); *see also Costello v. City of*

*Burlington,* 632 F.3d 41, 51 (2d Cir. 2011) ("[i]f no constitutional right would have been violated

were the allegations established, there is no necessity for further inquiries concerning qualified

immunity" (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  The Decision & Order,

moreover, unequivocally held that much of the conduct alleged by Plaintiff in support of this

claim was legally insufficient. *See, e.g., Bermudez*, 783 F. Supp. 2d at 589-90 (finding Officer

Diaz and Stroman's screaming "Praise the Lord" or "Hallelujah" not severe or pervasive enough

to alter the work environment and Officer Diaz's calling Plaintiff a religious hypocrite and

accusing her of hiding behind her religion in August or October 2007, to be evidence of

"personal animosity," not religious hostility).[4]

    In sum, under the Decision & Order, Plaintiff's hostile work environment claims are

limited to those premised on gender and sexual harassment.  To the extent they have not already

---

[4]     Bermudez's testimony also indicates that Stroman's insensitive reference to her as a "religious fanatic" and his unseemly and hyperbolic response to her invitation to church were similarly in the context of his "personal animosity" towards plaintiff and his own personal antipathy toward religion. While certainly insensitive and offensive, these comments did not create an objectively hostile work environment based on Plaintiff's religion. *See, e.g., Shabat v. Bilotti,* No. 96-7638, 1997 WL 138836, at *1 (2d Cir. Mar. 18, 1997) (affirming grant of summary judgment where incidents were not objectively hostile to religion, but "merely construed that way by [plaintiff]"); *see also Garvin v. Potter*, 367 F. Supp. 2d 548 (S.D.N.Y. 2005) (insensitive and offensive comment that Plaintiff was "not flexible enough with his religion" was not objectively hostile); *Kaplan v. Banque Nationale de Paris*, No. 94 CIV. 3965, 1995 WL 753900 (S.D.N.Y. Dec. 19, 1995) (defendants telling plaintiff "not to be so Jewish about it" was an isolated offensive utterance).  In addition, while Stroman's comment that Bermudez was an "emotionally disturbed person" in light of her expression of faith certainly evinces hostility toward religion, Plaintiff has not shown that this single incident "work[ed] a transformation of [her] workplace" as would be required to maintain a hostile work environment on this incident alone. *Alfano*, 294 F.3d at 374.

19

been dismissed (e.g., as against the City of New York), the Court grants Defendants' motion for summary judgment on all other hostile work environment claims.[5]

3. *Genuine disputes of fact exist as to whether Plaintiff subjectively perceived her work environment as hostile.*

One new argument Defendants have raised on this motion with respect to Plaintiff's hostile work environment claims is that they fail because there is no evidence from which a reasonable jury could conclude that Plaintiff subjectively perceived her work environment as hostile. As to Officer Sanabria, Defendants cite Plaintiff's admission that she danced with him at a December 2004 NYPD Christmas party, and the fact that she did not include any grievances against him in her October 2006 OEEO Complaint. As to Lieutenant Stroman, Defendants argue that such a conclusion follows from the invitations she extended to him to attend church with her and her confirmation, and the fact that she gave him a flask for Christmas in December 2004.

The Court is unpersuaded. Plaintiff testified, for example, that she invariably rebuffed Sanabria and Stroman's persistent sexual advances, that she felt uncomfortable, fearful, isolated and ostracized as a result of all Defendants' actions and that she eventually sought counseling with a psychologist. (*See, e.g.*, 2010 Bermudez Dep. 81:2-5, 84:5-16, 91:12-24.)   There is also no dispute that she filed formal complaints and a transfer request to a unit away from the officer defendants. This is ample evidence from which a jury could conclude that she subjectively perceived her work environment as hostile. *See, e.g., Feingold v. New York*, 366 F.3d 138, 151 (2d Cir. 2004) (holding that a "rational fact-finder could conclude that [plaintiff] subjectively experienced a hostile work environment," where plaintiff submitted affidavit averring that "the

---

[5]      This determination, however, does not preclude Plaintiff from offering her evidence of hostility based on other protected characteristics in support of her gender and sexual harassment based hostile work environment claims. *See, e.g., Feingold v. New York*, 366 F.3d 138, 151-52 (2d Cir. 2004).

hostile treatment took a toll on him, causing him to become depressed, to dread going to work, to seek a transfer, and to lose his desire to socialize with people in general").[6]

### B. Plaintiff's claims against the City of New York.

> *1. Plaintiff has not presented sufficient evidence to sustain her §§ 1981 and 1983 claims against the City of New York.*

A municipal defendant can only be held liable under §§ 1981 and 1983 if a plaintiff demonstrates that the alleged deprivation of his or her constitutional rights resulted from a municipal policy, custom or practice. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 733-36 (1989) (under § 1981); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978) (under § 1983). A plaintiff can make such a showing, by demonstrating, for example, that (1) a practice of municipal officials was "so 'persistent or widespread' as to constitute 'a custom or usage with the force of law,'" or, (2) that a practice of subordinate employees was "'so manifest as to imply the constructive acquiescence of senior policy-making officials.'" *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004) (quoting *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 870-71 (2d Cir. 1992)); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). Here, Plaintiff argues that her §§ 1981 and 1983 claims against the City of New York should survive summary judgment because of the alleged involvement of Inspector Bax and Lieutenants Stroman and Neusch who are, in her view, policy-making officials. However, the law is clear

---

[6] *See also Price v. Cushman & Wakefield, Inc.*, 808 F. Supp. 2d 670, 694 (S.D.N.Y. 2011) (denying motion for summary judgment and rejecting argument that Plaintiff lacked subjective belief of hostility because of an email in which he wrote that he "love[d] it [at the job], despite some min[o]r annoyances," on the grounds that "[a] jury could conclude that [plaintiff] privately believed he was being harassed, and yet still sent an e-mail showing a brighter public face"); *Hubbard v. Port Auth. of N.Y. and N.J.*, No. 05 Civ. 4396(PAC), 2008 WL 464694, at *9 (S.D.N.Y. Feb. 20, 2008) (plaintiffs established genuine issues of fact regarding their subjective perception of the work environment because in their "opposition [to the motion for summary judgment] and in complaint letters contemporaneous with the alleged abuse, [p]laintiffs express their humiliation, fear, and frustration stemming from their treatment").

that such a conclusory assertion that defendants are policy making officials is not evidence from which a reasonable jury could infer that the defendants qualify as such. *See, e.g., Gurevich v. City of N.Y.*, No. 06 Civ. 1646 (GEL), 2008 WL 113775, at *5 (S.D.N.Y. Jan. 10, 2008) (granting summary judgment to City of New York under *Monell* because plaintiff failed to adduce evidence that lieutenant involved in alleged unconstitutional arrest had "final policymaking authority"). Accordingly, the Court grants the City of New York's motion for summary judgment on these claims.

> 2. *Plaintiff has offered sufficient evidence of retaliation to maintain her NYCHRL only.*

The City of New York also moves for summary judgment on all of Plaintiff's retaliation claims. As all of Plaintiff's §§ 1981 and 1983 claims against it have been already dismissed for the reasons described in Section IV-B-1, *supra*, the Court will only evaluate the NYSHRL and NYCHRL retaliation claims. As to those claims, Plaintiff asserts that she engaged in protected activity when she filed her two OEEO complaints of discrimination and verbally objected to the perceived harassment, and that Defendants unlawfully retaliated against her by ostracizing her and excluding her from meetings.[7]

NYSHRL retaliation claims are reviewed under the burden-shifting approach promulgated by the Supreme Court in *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802-04 (1973). *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). Under *McDonnell Douglas*, a plaintiff must first establish a *prima facie* case of retaliation by showing: (1) "participation in a protected activity"; (2) the defendant's knowledge of the protected activity;

---

[7]     Plaintiff also alleges retaliation in the form of being called a liar by Sergeant Neusch. However, as she has only offered her own inadmissible hearsay evidence to support this contention, and the Court will therefore not consider this assertion here. *See, e.g.* Fed. R. Civ. P. 56(d).

(3) "an adverse employment action"; and (4) "a causal connection between the protected activity and the adverse employment action." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005) (citation and internal quotation marks omitted). "Once the plaintiff has established a *prima facie* showing of retaliation, the burden shifts to the employer to articulate some legitimate, non-retaliatory reason for the employment action." *Kwan*, 737 F.3d at 845. After the defendant does so, the presumption of retaliation arising from the establishment of the *prima facie* case vanishes, and the onus is then on the plaintiff to establish that the defendant's proffered reason(s) are pretextual. *Kwan,* 737 F.3d at 845.

NYCHRL retaliation claims are similarly governed by *McDonnell Douglas*'s burden-shifting framework. *Malena v. Victoria's Secret Direct*, LLC, 886 F.Supp.2d 349, 361–62 (S.D.N.Y. 2012). However, because of the NYCHRL's broader scope, a plaintiff is not required to show, "a material adverse action" under the NYCHRL, but can prove their claim by instead showing that "the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 112 (2d Cir. 2013) (internal citation omitted). As with the NYSHRL, however, "the NYCHRL require[s] a causal connection between an adverse act and a protected activity to prove a retaliation claim." *See, e.g.*, *Dudley v. N.Y.C. Hous. Auth.*, No. 12 Civ. 2771(PGG), 2014 WL 5003799, at *25 (S.D.N.Y. Sept. 30, 2014).

Defendants do not contend that Plaintiff did not engage in protected activity or that the relevant actors had no knowledge of it, but assert that Plaintiff's purported form of retaliation is insufficient as a matter of law. This Court's review of the relevant case law indicates that while this is true under the NYSHRL, *see, e.g., Cotterell v. Gilmore*, No. 12–cv–3808 (ADS)(GRB), 2014 WL 6886079, at *8 (E.D.N.Y. Dec. 8, 2014) (nothing that "[p]laintiff's exclusion from

certain meetings plainly does not rise to an 'adverse employment action' under NYSHRL");

*Rivera v. Orange Cnty.*, No. 10 CV 9134(VB), 2013 WL 812016, at *9, (S.D.N.Y. Mar. 5, 2013)

("excluding [plaintiff] from meetings . . . and generally making him feel isolated at work ... [do]

not qualify as an adverse employment action" for NYSHRL retaliation), such evidence is

sufficient under the NYCHRL.  *See, e.g., Albunio v. City of N.Y.*, 16 N.Y.3d 472, 476 (2011)

(finding that "shun[ing] and exclud[ing] [employee] from meetings" to be sufficient retaliatory

action under NYCHRL); *Schanfield v. Sojitz Corp. of Am.*, 663 F. Supp. 2d 305, 342-43

(S.D.N.Y. 2009) (denying motion for summary judgment on NYCHRL claims where plaintiff

asserted retaliation in the form of, *inter alia*, "exclusion from meeting").  Accordingly, the City

of New York's motion for summary judgment is granted as to Count XIV (NYSHRL retaliation),

but denied as to Count XX (NYCHRL retaliation).

## V.    CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment (ECF No. 65) is

**GRANTED IN PART and DENIED IN PART**.  All claims against the City of New York,

except for Counts XII, XV, XVIII, XX and XXI, are dismissed.

The Court will also hold a status conference on **April** 16 **, 2015 at** 11 : 00

a .m.  Counsel should report in person to Courtroom 1306 at the Thurgood Marshall United

States Courthouse, 40 Foley Square, New York, NY at that date and time, and should come

prepared to discuss their availability for trial.

**SO ORDERED.**

**Dated:**  March 31, 2015

         **New York, New York**
         **ANDREW L. CARTER, JR.**
         **United States District Judge**